**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LILLIAN BORICH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ) | No. 12 C 2367 |
| BP, P.L.C., BP EXPLORATION & ) | |
| PRODUCTION, INC., BP PRODUCTS ) | Judge George M. Marovich |
| NORTH AMERICA, INC. ) | |
| BP AMERICA, INC. and ) | |
| ROBERT DUDLEY, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

After plaintiff Lillian Borich's ("Borich") employment was terminated, she filed in the Circuit Court of Cook County a five-count complaint against defendants BP, p.l.c.; BP Exploration & Production, Inc.; BP Products North America, Inc.; BP America, Inc. (collectively, the "BP defendants") and Robert Dudley ("Dudley"). Defendants removed the case to this court. The Court has jurisdiction over this case, because Borich's first count arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). She also asserts claims for fraudulent misrepresentation, conspiracy to defraud, aiding and abetting fraud and breach of contract. Defendants have moved to dismiss. For the reasons set forth below, the Court grants in part and denies in part the motion to dismiss.

**I.      Background**

The Court takes as true the allegations in plaintiff's complaint. The Court also considers the documents attached to plaintiff's complaint. Fed.R.Civ.P. 10(c).

Defendant BP, p.l.c. is incorporated in England and Wales and has its principal place of business in London. It has a number of subsidiaries that are also defendants. They include BP Exploration & Production, Inc. (a Delaware corporation), BP Products North America, Inc. (a Maryland corporation), and BP America, Inc. (a Delaware corporation). Dudley is currently the CEO of BP, p.l.c.

A BP defendant employed plaintiff Borich from about May 2004 until it terminated her employment on November 30, 2008. For the first three years, Borich worked as a Strategic Account Manager in Warrenville, Illinois.

Next, in 2007, Borich was offered and accepted the position of Commercial Marketing Manager in Kiev, Ukraine. In this position, Borich was employed by BP Products North America, Inc., but she performed work for an entity called TNK-BP. Five percent of TNK-BP Holding was publicly traded and the remaining ninety-five percent was owned by TNK-BP International Limited. TNK-BP International Limited, in turn, had two 50% owners: BP, p.l.c. and Alfa-Access-Renova ("AAR"), a consortium of Russian businessmen. (In her complaint, Borich often refers to "TNK-BP," and it is not clear whether she means TNK-BP Holding, TNK-BP International Limited or both. The Court uses her terms.) In 2007 and part of 2008, defendant Dudley was the CEO of TNK-BP.

Unbeknownst to Borich, Dudley and the BP defendants had devised a scheme to "wrest control" of TNK-BP from AAR, and they needed Borich to make it happen. Borich alleges that business is done differently in Russia and Ukraine, where business is conducted via "personal

relationships," "unwritten rules and agreements," "illegal payments, protection schemes" and other activity that is illegal in the United States and the United Kingdom. Borich was sent over to use a "Western-style sales and distribution network." Borich was tasked with "circumventing TNK's existing personal relationships with its re-sellers, jobbers and joint venture partners by marketing BP-TNK products directly to end customers and consumers, with no regard for [the] existing personal relationships, protected territories, established rules or agreements or the illegalities associated with this activity." Borich alleges that the Western-style business strategies she was supposed to employ were doomed to fail and that failure was the BP defendants scheme all along. Dudley and the BP defendants knew that Borich's job would "ultimately depress the TNK-BP's capitalization so that defendant BP, p.l.c. could wrest control of TNK-BP at a drastically reduced price."

When Borich arrived in Kiev in June 2007, she was surprised to learn how business was done there. She learned of illegal payments to persons in Russia and Ukraine. She learned about the bribes and kickbacks that were necessary to obtain government contracts. Borich alleges that BP, p.l.c. and Dudley "either actively participated in illegal payments or bribes or was [sic] fully aware that these illegal payments and bribes were being made." (This allegation is somewhat at odds with Borich's theory that the defendants were trying to instill Western-style business practices in order to reduce TNK-BP's market capitalization, but a plaintiff is allowed to plead in the alternative.)

In Kiev, Borich was supervised by Mark Goodwin ("Goodwin"), who was the Deputy Director of TNK-BP. Goodwin initiated a personal relationship with Borich. That relationship lasted until September 2007, when Goodwin went to London to meet with managers of the BP

defendants. Borich alleges that Goodwin and managers of the BP defendants discussed: (1) the fact that Borich was "questioning . . . the legality of certain activity that was going on in Kiev, Ukraine"; and (2) that she was a "liability" because "she was either incapable or unwilling to 'play ball' and maintain the ruse that Robert Dudley and BP Defendants were attempting to perpetuate regarding TNK-BP." When Goodwin returned to Kiev from London, he broke off his personal relationship with Borich.

The complaint contains some other extraneous details, the relevance of which are not entirely clear. For example, Borich alleges that, at some point, a TNK-BP shareholder filed suit and obtained an injunction against BP, p.l.c. Borich does not say when this happened or what court issued the injunction. Borich alleges that the "injunction . . . ultimately resulted in all BP expatriates being forced to leave their jobs in Russia and Ukraine.

On March 21, 2008, for "no legitimate purpose," Goodwin canceled Borich's contract and Ukraine work visa. Borich was told that her position was being phased out and that BP had no comparable jobs for her. Borich alleges that she was placed on "garden leave" which was used to "freeze [Borich] out of any opportunity to obtain another position within the BP organization." BP defendants terminated Borich's employment on November 30, 2008, because she had been unable to find another position within BP by that time.

Before Borich accepted the position in the Ukraine, the BP defendants had failed to inform her of several facts. They had failed to tell her that by accepting the Ukraine position, she was giving up her old position and could not have it back. They had failed to tell her that she was not guaranteed a position with a BP subsidiary when she returned to the United States. Had she been told these facts, she would not have accepted the Ukraine position.

Borich also includes in her complaint some allegations that are specific to her RICO claim. Borich alleges that the defendants used an enterprise "to carry out its pattern of racketeering activity." The enterprise was made up of the five defendants themselves. Although not all of the enterprise's activities were unlawful, the defendants used the enterprise to conduct "mail fraud, wire fraud and money laundering." Borich alleges that "[s]uch violations were completed through course of conduct including bribes and illegal payments to Russian and Ukrainian individuals and entities in order to facilitate the Enterprise's interest in the expansion of TNK-BP." This behavior "injured Borich in her business or property."

Borich alleges what she describes as predicate acts. She alleges that defendants "used the mail and wires to fraudulently recruit BP Defendant employees in the United States ostensibly to work for TNK-BP, but in reality to work in furtherance of the Enterprises [sic] goal to favor BP p.l.c. over TNK in the TNK-BP joint venture." Specifically, Borich states that the defendants provided her paperwork about her Kiev position via the mail and wires. In addition, Borich alleges that defendants used the mail and wires to communicate "information pertaining to and in furtherance of the bribery and illegal payments made in Ukraine and Russia." Finally, Borich alleges that defendants "facilitated the payment of bribes or otherwise illegal payments to local individuals and entities in Ukraine and Russia in order to appropriate monetary gains from the TNK-BP joint venture, which BP Defendants would claim as legitimate revenue and profits going to BP, p.l.c." Borich alleges that "[e]ach predicate act had the same or similar purpose: They involved material misrepresentations, omissions and concealment in a scheme to obtain purportedly legitimate revenue from the TNK-BP joint venture through illegal processes."

Thus, from the beginning to the end of Borich's complaint, the scheme evolves from: (1) a scheme to apply Western-style business practices to TNK-BP so that its market capitalization would crash and BP could buy it cheaply; to (2) a scheme to use bribes to obtain illegitimate revenue and claim the revenue as legitimate.

Defendants move to dismiss.

## II. Standard on a motion to dismiss

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Bell Atlantic*, 127 S.Ct. at 1964-1965. "After *Bell Atlantic*, it is no longer sufficient for a complaint 'to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (quoting *Equal Employment Opportunity Comm'n v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). To survive a motion to dismiss, a claim must be plausible. *Iqbal*, 129 S.Ct. at 1950. Allegations that are as consistent with lawful conduct as they are with unlawful

conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Bell Atlantic*, 127 S.Ct. at 1974.

Certain allegations must be stated with particularity. For example, Federal Rule of Civil Procedure 9(b) mandates that all averments of fraud must be "state[d] with particularity." Fed.R.Civ.P. 9(b).

### III. Discussion

#### A. Plaintiff's RICO claim

Defendants move to dismiss plaintiff's RICO count for failure to state a claim.

Congress passed RICO to "eradicate organized, long-term criminal activity." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). The statute provides a civil cause of action for violations of 18 U.S.C. § 1962. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . "). Despite "widespread abuse" of civil RICO, RICO "has not federalized every state common-law cause of action available to remedy business deals gone sour." *Midwest Grinding*, 976 F.2d at 1025. "Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006).

In Count I, Borich asserts a civil claim under RICO § 1962(c). That section provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).  An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  A "pattern of racketeering activity" is "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(f).  Racketeering activity, in turn, includes a number of indictable offenses, including the oft-cited mail and wire fraud.  18 U.S.C. § 1961(a).  To establish a pattern under RICO, "it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* activity."  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989).  As the Supreme Court has explained:

> 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . .  A party alleging a RICO violation may demonstrate continuity over a closed period by providing a series of related predicates extending over a substantial period of time.  Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*H.J. Inc.*, 492 U.S. at 241-242.  Conduct without the threat of continued activity is not actionable.  *Gamboa v. Velez*, 457 F.3d 703, 709 (7th Cir. 2006).  There, the Seventh Circuit explained:

> Since, as the district court recognized, the amended complaint's allegations foreclosed any threat of continued criminal activity, the natural and commonsense result here is dismissal–the amended complaint cannot support the continuity element.  Restated, when, as here, a complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no

> indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim.

*Gamboa*, 457 F.3d at 709.

In order to state a claim under § 1962(c), Borich must allege that the defendants (1) conducted or participated in the conduct of (2) an enterprise (3) through a pattern of (4) racketeering activity. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998).

### I. Extraterritorial reach

Defendants first argue that Borich's RICO claim must be dismissed, because RICO does not apply extraterritorially.

In *Morrison v. Nat'l Australia Bank LTD.*, the Supreme Court reiterated that the "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison*, 130 S.Ct. 2869, 2877 (2010) (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991)). In *Morrison*, the Supreme Court concluded that §10(b) of the Securities and Exchange Act of 1934 does not apply extra-territorially. After *Morrison*, the Second Circuit held that RICO does not apply extraterritorially. *Norex v. Access Industries, Inc.*, 631 F.3d 29 (2d Cir. 2010). The parties agree that RICO does not apply extraterritorially, but they disagree about whether plaintiff seeks a domestic application of RICO or an extraterritorial one.

As the Supreme Court explained in *Morrison*, it is not always self-evident whether a plaintiff seeks extraterritorial application of a statute. The Supreme Court explained:

> [I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against

> extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.

*Morrison*, 130 S.Ct. at 2884. In *Morrison*, foreign investors alleged securities fraud in connection with a foreign company's securities that traded on a foreign exchange. The alleged misstatements, however, had originated in the United States. In concluding that §10(b) applied only to transactions in securities listed on domestic exchanges or domestic transactions of other securities, the Supreme Court explained:

> we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct, 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.'

*Morrison*, 130 S.Ct. at 2884.

When applying *Morrison* to RICO, courts have divided on the question of what part of RICO is the appropriate focus. A number of courts have concluded that, in determining whether a plaintiff seeks extraterritorial application of RICO, the focus is on whether the enterprise is extraterritorial. *Mitsui OSK Line Ltd v. Seamaster Logistics, Inc.*, __F.Supp.2d __, 2012 WL 1657108 at *4 (N.D. Cal. May 10, 2012) ("The relevant question is simply whether the enterprise is extraterritorial or not."); *Sorota v. Sosa*, 842 F. Supp.2d 1345, 1350-51 (S.D. Fla. 2012); *In re Le-Nature's, Inc. v. Krones, Inc.*, Case No. 9-1445, 2011 WL 2112533 at *3 (W.D. Penn. May 26, 2011) (holding that a RICO claim is not barred if a complaint alleges a domestic enterprise, because "RICO does not prohibit racketeering activities *simpliciter*–indeed, those activities are independently criminalized by statute–but only as related, in enumerated ways, to an enterprise"); *The European Community v. RJR Nabisco, Inc.*, Case No. 02-cv-5771, 2011 WL 843957 at *5 (E.D. N.Y. March 8, 2011) ("[T]he statute does not punish the predicate acts of

racketeering activity–indeed, each predicate act is, itself, a separate crime–but only racketeering activity in connection with an 'enterprise.'" . . . Because the 'focus' of RICO is the 'enterprise,' a RICO 'enterprise' must be a 'domestic enterprise.'"). That conclusion has some appeal, but this Court is persuaded by the courts that have concluded that the proper focus is the pattern of racketeering activity and its consequences. *Chevron Corp. v. Donziger*, __ F. Supp.2d __, 2012 WL 1711521 at *8 (S.D. N.Y. May 14, 2012) ("If there is a domestic pattern of racketeering aimed at or causing injury to a domestic plaintiff, the application of Section 1962(c) to afford a remedy would not be an extraterritorial application of the statute."); *CGC Holding Co., LLC v. Hutchens*, 824 F. Supp.2d 1193, 1209 (D. Col. 2011) ("The focus of the statute is the racketeering activity, i.e., to render unlawful a pattern of *domestic* racketeering activity perpetrated by an enterprise.").

This Court concludes that a domestic plaintiff injured by a domestic pattern of racketeering activity is not attempting to apply RICO extraterritorially. As it considers whether plaintiff has stated a claim, it will consider whether she has stated a domestic pattern of racketeering activity. Foreign racketeering activity will not be considered.

### ii. Pattern of racketeering activity

Defendants argue that plaintiff has not alleged a pattern of racketeering activity with the requisite specificity. Defendants argue that plaintiff asserts *generally* that defendants engaged in mail and wire fraud but fails to allege any instances of mail and wire fraud with *specificity*. Plaintiff, for her part, argues that she does not need to be specific in her allegations of fraud.

The Court agrees with defendants. Rule 9(b) of the Federal Rules of Civil Procedure requires that allegations of fraud must be stated with specificity. Fed.R.Civ.P. 9(b). Rule 9(b)

"is of course applicable to allegations of fraud in a civil RICO complaint." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). The purpose of Rule 9(b):

> is to minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual. In the typical commercial case there is a substantial interval between the filing of the complaint and the completion of enough pretrial discovery to enable the preparation and disposition of a motion by the defendant for summary judgment. Throughout that period a claim of fraud will stand unrefuted placing what may be undue pressure on the defendant to settle the case in order to lift the cloud on its reputation. The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless. It also forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen against spurious fraud claims.

*Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748-749 (7th Cir. 2005). The Rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). Put another way, the Rule calls for the plaintiff asserting fraud to allege the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

In plaintiff's complaint, she alleges most of the instances of mail or wire fraud generally, which is insufficient. For example, plaintiff alleges that defendants "sent numerous other mail and wire transmissions that will serve as additional predicate acts." Such general allegations of mail or wire fraud do not suffice.

Plaintiff, however, alleges with greater specificity two uses of the mail or wires, and the Court will consider whether she has been specific enough with respect to those two. First, plaintiff alleges that she was fraudulently recruited to work for TNK-BP, when she was actually

going to be working to help BP, p.l.c. wrest control of TNK-BP from AAR.  Borich alleges that the BP defendants sent her a letter describing her position in Kiev.  Although defendants argue that Borich did not describe this alleged mailing with specificity, the Court disagrees.  Borich attached a copy of the mailing to her complaint.  The attachment itself includes the sender, the date it was sent, the recipient and the content.  Thus, Borich has specifically alleged one mailing.  Next, Borich alleges that in May 2008, she received an email from Tony Considine.  What is not alleged in Borich's complaint is what the email said and how it related to a fraudulent scheme.

In her complaint, Borich fails to allege a pattern of racketeering activity, because she fails to allege with the requisite specificity at least two predicate acts of mail or wire fraud.[1]

### iii. Standing

Finally, defendants argue that Borich lacks standing to pursue a claim under § 1964(c) for a violation of § 1962(c).  The parties agree that Borich may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of her injury.  *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

The "compensable injury flowing from a violation of [§ 1962(c)] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)).  The Court does not decipher from plaintiff's complaint any injury

---

[1] Defendants do not argue that the asserted predicate acts lack continuity (and therefore cannot be a pattern of racketeering even if they are specifically alleged) or that plaintiff has failed to allege a scheme to defraud (as is required to state wire or mail fraud), so the Court does not consider those issues.

except the termination of her employment, and plaintiff does not point any out. The termination of her employment, however, did not result from any of the predicate acts plaintiff has alleged. Thus, she lacks standing under RICO.

This case might be different if plaintiff had alleged retaliatory termination under the Sarbanes-Oxley Act, which is a predicate act under RICO. 18 U.S.C. §§ 1513(e), 1961(1); *DeGuelle v. Camilli*, 664 F.3d 192, 200-201 (7th Cir. 2011) ("Prior to enactment of the Sarbanes-Oxley Act, retaliation against an employee in the form of interference with his or her lawful employment was not considered a racketeering act, and courts denied RICO standing to employees terminated for refusing to cooperate in an alleged racketeering scheme.") (internal citations omitted). Borich has not alleged such a predicate act, and it is not clear whether she could.

For all of these reasons, the Court dismisses Count I without prejudice. It is not clear to this Court whether Borich can cure the defects in her complaint, but it will grant her 28 days to file an amended complaint.

### B. Borich's state-law claims

In her complaint, Borich asserts four state-law claims, and defendants move to dismiss those, as well. The Court denies this portion of defendants' motion.

A district court may "decline to exercise supplemental jurisdiction" over pendent state law claims if the court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). A district court's decision to relinquish supplemental jurisdiction is "the norm, not the exception." *Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001) (quoting *Fisher v. Information Resources, Inc.*, 873 F.2d 136, 140 (7th Cir. 1989)).

Accordingly, the Court will remand Borich's remaining claims. The Court, however, will not remand the claims unless Borich fails to file an amended complaint within 28 days.

## IV. Conclusion

For the reasons set forth above, the Court grants in part and denies in part defendants' motion to dismiss. The Court dismisses Count I without prejudice. If Borich believes she can cure the deficiencies, she may file an amended complaint within 28 days. If Borich does not file an amended complaint within 28 days, the Court will: (1) assume that she cannot cure the defects; (2) dismiss Count I with prejudice; and (3) remand Borich's remaining claims to the Circuit Court of Cook County.

ENTER:

/s/ George M. Marovich
George M. Marovich
United States District Judge

DATED: October 23, 2012